**SDS USA, INC., Plaintiff,**

v.

**KEN SPECIALTIES, INCORPORATED, Defendant.**

**No. CIV. 99–133.**

United States District Court, D. New Jersey.

Nov. 28, 2000.

Keith E. Gliman, Lerner, David, Littenberg, Krumholz & Metlik, Westfield, NJ, for SDS USA, Inc.

Marvin S. Gittes, North Bergen, NJ, David W. Denenberg, Cobrin & Gittes, New York, NY, for Ken Specialties, Inc.

## OPINION

WALLS, District Judge.

Plaintiff SDS USA, Inc. moves for summary judgment for patent infringement. Defendant Ken Specialties filed an Opposition, a cross-motion for summary judgment for non-infringement, and asserted the affirmative defenses of "obviousness" and "best mode." The defendant also filed a "Supplemental and Reply Brief" for a summary judgment that its new "split-pin" machine does not infringe SDS EasyBender machine. Plaintiff's motion is granted and the motions of the defendant are denied.

## BACKGROUND

U.S. Patent No. 5,870,919 ("919 patent") was issued to SDS as assignee on February 16, 1999. This patent teaches an "apparatus" (claims 1–7), "method" (claims 8–11) and "system" (claim 12) to aid the mass production of cardboard boxes and similar items. The claimed machine shapes a die from metal rule. The die, later placed in a diecutting machine, is used to stamp out box blanks from sheet material such as cardboard. The '919 patent issued from U.S. Patent Application No. 49,391 ("'391 application"), filed in March 1998 which was a continuation of U.S. Patent Application No. 668,379 ("'379 application"), filed in June 1996. The '379 application claimed the priority date of a Korean patent application filed in June 1995. The inventor of the '919 patent is Byung–Jun ("Brian") Song, President of Plaintiff. On August 3, 2000, this court issued a "Markman" ruling, which found that the patent was not invalid for indefiniteness and satisfied the written description requirement. Then the Court construed the various claims of the '919 patent that are the subject of the present motions of summary judgment.

## ANALYSIS

**1. *Summary Judgment Standard***

Summary judgment is appropriate where the moving party establishes that

"there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3rd Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3rd Cir.1980).

In a patent-infringement case, a district court should approach a motion for summary judgment on the fact issue of infringement with great care. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir. 1985), *overruled on other grounds Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976–79 (Fed.Cir.1995) (*en banc*). Summary judgment may, however, properly be decided as a matter of law when no genuine issue of material fact exists, and no expert testimony is required to explain the nature of the patented invention or the accused product or to assist in their comparison. *See, e.g., Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 36, 50 S.Ct. 9, 74 L.Ed. 147 (1929); *Singer Mfg. Co. v. Cramer*, 192 U.S. 265, 275, 24 S.Ct. 291, 48 L.Ed. 437 (1904).

## 2. Patent Infringement Analysis of the '919 Patent

■ "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995). A patent infringement analysis involves two steps. The first one—claim construction—is a question of law. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996); *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir.1998). This court's recent opinion, *SDS, USA, Inc. v. Ken Specialties*, 107 F.Supp.2d 574 (D.N.J.2000) has construed the claims that are the subject of the present dispute. The second one—comparison of the properly construed claims to the accused infringing product, is a question of fact. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The claim language is illuminated by the written description and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1309 (Fed.Cir. 1999). Although the question of infringement is generally one for a jury, summary judgment of infringement may be granted when a rational jury could only conclude that infringement has occurred. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974–75 (Fed.Cir.1999) (re-

versing summary judgment of non-infringement and granting judgment of infringement because no reasonable jury could determine that any claim limitation was absent from the accused device).

■ The plaintiff has claimed that defendant's products "literally infringe" its '919 patent. Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, that is, when the properly construed claim reads on the accused device exactly. *Amhil Enterprises v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.Cir.1996). It is necessary to examine the limitations in each claim to determine if defendant's "Multi–Bender" machine literally infringes plaintiff's "EasyBender" machine: First, a discussion of the general concepts of "ribbon stock" and a "cutter" which appear in several of the claims. Afterwards, each claim of the '919 patent will be examined to determine if there is literal infringement.

## A. Preliminary Definitions

### 1. "Ribbon Stock"

It is useful to define some basic terms such as "ribbon stock" and "cutter" that guide the analysis. At the *Markman* hearing, defendant asserted that ribbon stock could only be precut steel rule. (Ken Non–Infr. Br. at 20–21). However, the *Markman* opinion concluded that ribbon stock is not limited to precut steel rule, and instead, "refers to the material from which the preferred-embodiment 'cutting blade' is constructed." *Plaintiff v. Ken Specialties*, 107 F.Supp.2d at 579. Because ribbon stock is not limited to precut steel rule, Ken's non-infringement arguments as to ribbon stock are rejected.

### 2. The "Cutter"

The cutter is another limitation which appears throughout several of the claims. This court has adopted as the definition of "cutter" (an element which appears in claim 12 of the '919 patent) the meaning found in the "Glossary of Terms" of the

International Association of Diecutting and Diemaking ("I.A.D.D.") *SDS*, 107 F.Supp.2d at 594 as simply "a term used to describe a bench tool used to cut steel rule stock in the manufacture of steel rule dies." *Id.* The defendant's effort to limit the "cutter" under § 112 ¶ 6 to correspond only to the particular cutter shown in Korean Patent No. 80607 has been rejected.

Defendant argues that because the patent teaches a machine that "cuts, miters and notches," and that its machine only cuts, there is no infringement. (Ken Non–Infr. Br. at 14, citing Kengott Decl. ¶ 31.) However, the claim has been construed to require only the cutting of steel rule, without mentioning mitering or notching. Defendant freely admits that its cutter is simply a "sheer cutter" (*Id.* at 18). Because defendant's machine has a cutter like the one described in the IADD Glossary, non-infringement argument regarding this limitation cannot be accepted.

## B. The "Transferring Unit"

■ Claim 1 begins by describing a transferring unit. The *Markman* opinion found that the transferring unit (or transfer roller) was a mechanism that moves the ribbon stock from a roller at the beginning of the assembly line through a longitudinal passage formed by a guide. Plaintiff contends that defendant's products meet this limitation.

The transferring unit of the accused product "is an opposing pair of rollers spaced apart from each other to define a separation through which said steel rule is fed." (Ken Non–Infr. Br. 2) Ken's president, Dale Kengott, admitted as such. (See Kengott Non–Infr. Decl. ¶ 13).

Plaintiff argues that defendant's products infringe method claims 8–11. These method claims do not require a "transferring unit," but only a step of "transferring of the ribbon stock through a passage formed by a guide, said passage defining a longitudinal axis ..." (Plaintiff Br. 4). According to Plaintiff, the use of Ken's ac-

cused product involves such a step. *Id.* Ken has not refuted this assertion.

### C. "The Guide"

There is a dispute whether Ken's product infringes upon "the guide." Claim 1 also calls for "a transfer unit for transfer of ribbon stock through a passage formed by a guide ..." Plaintiff asserts that the steel rule in Ken's accused product travels through a guide in exactly the same manner as shown in the '919 specification. (See Plaintiff Infr. Br. at 7–8). According to Plaintiff, there is no genuine issue as to whether in Ken's accused product, the ribbon stock is transferred through a passage formed by a guide. Ken has confirmed the accuracy of Document Plaintiff–0002 (Gilman Infr. Decl. Exh. 13) and Defendant's Document Numbers 8–87 (Gilman Infr. Exh. 12) which show the offending method.

■ In the '919 patent, the roller urges the blank material into and through a guide. As shown in Ken's document 8–87, the blade material goes through an "intermediate guide" and "auxiliary guide" before it goes through the "main guide." (See Plaintiff Infr. Br. 5–6). Ken does not refute that its product works exactly like Plaintiff's product, but merely offers that the ribbon stock in the accused product passes through not one, but three guides. However, one cannot avoid infringement by adding elements if each element in the claims is found in the accused device. In other words, if an accused device contains all of the elements of the patented device, it cannot escape an infringement claim merely by adding a few elements. *Temco Elec. Motor Co. v. Apco Mfg. Co.*, 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298 (1928); *A.B. Dick Co. v. Burroughs Corp.* 713 F.2d 700, 703 (Fed.Cir.1983).

### D. The "Longitudinal Axis"

Claim 1 of the '919 patent also describes a longitudinal axis. Defendant argues that even though its device has a guide, there is no longitudinal axis. However, as pointed out by Plaintiff, claim 1 refers to a transferring unit for transfer of ribbon stock through a passage formed by a guide. If there is a passage, it "necessarily" defines a longitudinal axis. Ken admits as much in its brief: "The passage [in the '919 patent] defines a longitudinal axis ... Thus, the guide [in the '919 patent] is a hollow structure in which a longitudinal axis is defined by a passage." (Ken Non–Infr. Br. 10). Since Ken's product has a guide, it necessarily defines a longitudinal axis.

Ken tries to avoid infringement by arguing that the opposing pair of rollers which correspond to the "transferring unit" limitation do not themselves have a hollow structure, necessary to define a longitudinal axis. (See Ken Non–Infr. Br. 10). According to Plaintiff, Ken confuses "transferring unit" and "guide." The transferring unit transfers ribbon stock through a passage formed by a guide, and that passage defines a longitudinal axis. Plaintiff argues that defendant Ken's device is within this requirement. The Court agrees.

### E. Rotary Assembly Limitation

Claim 1 also calls for "a rotary assembly having first and second rotary bodies spaced to receive ribbon stock there between ..." In response to requests for admission, the defendant admits that the Multi–Bender (MB 900–B or MB 710–B) includes two rotary bodies which are spaced from one another. (Gilman Infr. Decl. Exh. 11, Resp. to Req. for Admis. Nos. 7, 7A; *see also* Resp. to Req. for Admis. No. 56, admitting that "Documents Plaintiff–00002 shows two rotary members at 43.") The Plaintiff–00002 drawing clearly depicts how the pulleys 43 are spaced apart and how the metal ribbon stock travels between them. According to Plaintiff, Ken's product literally infringes the '919 patent based on the rotary assembly. The Court agrees with the plaintiff.

## F. The "At Least One Retractable Elongate Member" Limitation

Claim 1 requires, "at least one retractable elongate member, said elongate member mounted for movement between a retracted position where said elongate member is disengaged from at least one of said rotary bodies and an extended position where said elongate member engages both said first and second rotary bodies ..."

At the *Markman* hearing, Ken adamantly argued that 'elongate member' referred to two or more folding members. The Court did not accept that definition and held that "at least one" meant one or more. *Id.* at 589–90. The Court also rejected Ken's contention that this was a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6. Because Ken's Multi-Bender has one retractable elongate member, it literally infringes the '919 patent.

One of the defendant's present arguments against plaintiff's motion is that the bending pins in the accused product only bends "uncut" steel rule. In answer to plaintiff's Rule 56.1 Statement ¶¶ 8–9, defendant asserts "the bending pins of the accused product only bend uncut steel rule." However, this court has already refused Ken's argument that "ribbon stock" is limited to precut steel rule. *Id.* at 579.

Finally, Ken's assertions of non-infringement that compare its product to plaintiff's commercial product and brochures relating thereto are irrelevant. (See Ken Non–Infr. Br. at 12). It is improper to compare the defendant's accused device to a commercial embodiment of the patentee's invention. *See, e.g., Glaxo, Group Ltd. v. TorPharm, Inc.,* 153 F.3d 1366 (Fed.Cir.1998); *Zenith Lab., Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed.Cir.1994); *Martin v. Barber,* 755 F.2d 1564, 1567 (Fed.Cir.1985). The Court finds that defendant's accused device plainly meets the "at least one retractable elongate member" limitation.

## G. The "Arcuate Motion" Limitation

The final limitation of claim 1 calls for, "said rotary assembly configured for arcuate motion relative to said guide from a first position toward at least one second position to fold a portion of said ribbon stock by said elongate member." Ken admits that the upper and lower pulleys of its Multi–Bender are rotatable (Gilman Decl. Infr. Exh. 11), and that the bending pin moves with the "gears" (i.e., pulleys) in an arcuate motion. (Gilman Decl. Infr. Exh. 15, Kengott Dep. at 177:14–18.) It is clear that Ken's two pulleys rotate, that is, go through "arcuate motion" relative to the guide from one position to another, and that the ribbon stock is folded by the elongate member or the "bending pin." The Multi–Bender infringes the '919 patent for claim 1.

## H. The "Sequentially Positioned" Limitations

Dependent claim 2 calls for a ribbon stock folding apparatus as recited in claim 1 "wherein a retractable member can be sequentially positioned on opposite sides of said longitudinal axis." Ken's president has testified that the bending pin is on one side of the steel rule at a time, and can bend from either side of the rule. (Kengott Dep. at 177:14—178:9) According to Plaintiff, this demonstrates that Ken's accused device meets the "sequentially positioned limitations." In its Opposition brief, Ken did not respond to the point nor offer any evidence to demonstrate that its accused machine does not infringe claim 2's "sequentially positioned" limitation. Without facts from defendant which refute the above, plaintiff is granted summary judgment for infringement on this claim.

## I. The "Supply of Metallic Ribbon Stock" Limitation

Dependent claim 7 and 12 specifically call for a supply of metallic ribbon stock. Ken's only response was its now rejected argument that the supply of ribbon stock

only meant "precut." It is not denied that the accused products include a supply of elongate metallic material (or "metallic ribbon stock"). Ken has not advanced any facts of refutation. Consequently, claims 7 and 12 are literally infringed.

## J. The Method Claims

Independent method claim 8 is substantially coextensive with claim 1. Plaintiff argues that the defendant's use of continuous lengths of metallic rule meets the "ribbon stock" limitation found in claim 8. Ken has not disputed this.

Independent method claim 10 is the method version of the "sequentially positioning" limitation earlier discussed. Ken's accused machine meets this limitation. Also, claim 11 is the method counterpart of claim 6, in that it adds the notion of folding ribbon stock in a direction substantially transverse to the longitudinal axis. Ken's accused device infringes both Claims 6 and 11 because each of the machines bends the metallic ribbon stock with the elongate member engaging both the first and second rotary bodies.

Independent method claim 9 is the same as claim 8, with the further step of "cutting ribbon stock at a predetermined length." Ken was asked to admit that its accused Multi–Benders include a device for cutting metallic material at a predetermined length. Ken denied these requests because according to the defendant, the '919 patent required that *cutting take place before bending,* whereas in the accused product, *cutting takes place after bending.* However, Ken admitted that "[t]he Multi–Bender cuts continuous rule at a predetermined length after bending" (*See* Gilman Infr. Decl. Exh. 11, Resp. to Req. for Admis. Nos. 32, 32A). Nothing in claim 9 requires that cutting take place before bending. Ken's admission that the use of its benders includes the step of cutting the ribbon stock at a predetermined length is evidence of infringement of claim 9.

## K. The System Claim

Most of the elements of system claim 12 have already been discussed. The last three elements are identical to elements in claim 1, and are present in the Ken machines for reasons already given. The first element of claim 12, "a supply of ribbon stock," is clearly present when blade material is present with Ken's devices.

The fifth element of claim 12, which calls for a cutter for cutting ribbon stock at a predetermined location, is present in Ken's products. It is undisputed that Ken's devices have a "cutter," and the "predetermined location" in Ken's device is upstream from the bender. The *Markman* opinion has determined that claim 12 contemplates cutting before *or* after bending.

The third element of claim 12 calls for, "a guide mounted in said frame, said guide having a passage therein, said passage defining a longitudinal axis." The fourth element calls for, "a transferring unit for controlled transfer of said ribbon stock through said passage in said guide." Claim 12 differs somewhat from claim 1 in that claim 12 specifically refers to the guide as a separate element, while claim 1 refers to it in the context of the "transfer unit." Plaintiff argues that Ken's products indisputably have a guide with a passage therein, and transferring unit (rollers) for transferring the ribbon stock through the passage in the guide. Ken provides no facts to challenge this. Plaintiff is entitled to summary judgment on claim 12.

## L. The "Reverse Doctrine of Equivalents" is Inapplicable

Ken argues that even if this court finds literal infringement of the '919 patent, there is no infringement under the "reverse doctrine of equivalents." Plaintiff complains that while Ken has established the literal existence of the doctrine, it has not provided facts that meet the standard for "the reverse doctrine of equivalents."

Defendant bears the burden of making out a *prima facie* case of the applicability of the reverse doctrine of equivalents. In its brief, Ken has only attempted to mount a defense to infringement for some of the claims of the '919 patent. As explained in *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1176 (Fed.Cir.1993), "[o]ne does not make a reverse doctrine of equivalents argument by simply mounting a defense to literal or doctrine of equivalents infringement."

Ken fails to mount a prima facie case because it compares the accused product not to the '919 patent, but to Plaintiff's commercial embodiment. This is the improper standard. Defendant's argument may be reduced to the difference between Plaintiff's *"cutting before bending"* and Ken's *"bending before cutting."* There may be advantages to do one before the other, but Ken has failed to demonstrate that reversing the sequence so dramatically departs from the technical principles of the '919 invention that literal infringement should be excused.

Finally, Ken urges reverse equivalency because the cutter set forth in Korean Patent No. 80607 can cut, notch, and miter, while Ken's accused product simply cuts. (See Ken Non–Infr. Br. at 17–18). However, this court has not construed any of the claims of the '919 patent to require notching or mitering, and only two of the claims require cutting at all. Ken's device cuts steel rule, and when a cut is made, one piece of steel rule becomes two pieces of steel rule. This cannot count as a "reverse equivalent" of the '919 patent, and, in fact, is very close to the claimed invention. Ken has failed to establish the applicability of the reverse doctrine of equivalents. This conclusion is bolstered by the maxim that instances in which the reverse doctrine of equivalents results in non-infringement are "statistically rare." Chisum, Patents, § 18.04[4] at 18–392 (Supp. 2000); *Caterpillar Tractor Co. v. Berco, S.p.A.,* 714 F.2d 1110, 1115 n. 3 (Fed.Cir.

1983). The reverse doctrine or equivalents is inapplicable; plaintiff's motion for summary judgment for infringement is granted.

### 3. *Ken's Obviousness Defense*

Before analyzing the merits of defendant's two principal defenses, obviousness and best mode, the Court addresses discovery related disputes raised by plaintiff. Defendant did not reveal to plaintiff its plans to assert an obviousness defense until after the close of discovery. In its defense, Ken asserts that obviousness requires claim construction. Before August 3, 2000, this court had not construed the claims, so defendant felt justified in withholding its plans to assert an obviousness defense. However, the Court finds that assertion of an obviousness defense does not first require claim construction. But since the plaintiff has not been prejudiced, defendant may assert its obviousness defense. Additionally, plaintiff complains that defendant did not assert its best mode defense until the end of the discovery period. Defendant responded that in the absence of a court order requiring it to disclose its defenses during discovery, it was entitled to update its responses until the end of discovery. Although the Court disagrees with Ken, in the absence of prejudice to SDS, defendant will be allowed to assert its best mode defense as well.

The Court now examines the merits of Ken's obviousness defense. Defendant asserts that its alleged infringement of the EasyBender machine should be excused for obviousness, a defense to patent infringement. A determination of obviousness requires two steps. First, claim construction is a question of law for the court. This court's *Markman* opinion construed the claims. *SDS v. Ken Specialties,* 107 F.Supp.2d 574 (2000). Next, the fact-finder compares the construed claim to the prior art. *Rockwell Int'l Corp. v. United States,* 147 F.3d 1358, 1362 (Fed.Cir.1998). 35 U.S.C. § 103 guides the analysis.

## A. Obviousness Test

■ Under 35 U.S.C. § 103:

"[a] patent may not be obtained (and is invalid for obviousness) . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains."

35 U.S.C. § 103; *See also In re O'Farrell,* 853 F.2d 894, 902 (Fed.Cir.1988). To determine obviousness, the invention is considered as a whole, and the claims considered in their entirety. *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1480 (Fed. Cir.) *cert. denied,* 525 U.S. 875, 119 S.Ct. 177, 142 L.Ed.2d 144 (1998), *citing Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567 (Fed.Cir.1983).

## B. Obviousness Findings

### 1. Scope and Content of the Prior Art

The '919 patent is a continuation of U.S. Patent No. 5,787,750 ("the '750 patent"). As such, the prosecution history of the '750 patent is related to the validity and enforceability of the '919 patent. *Abtox Inc. v. Exitron Corp.,* 122 F.3d 1019, 1027 (Fed. Cir.1997).

■ Defendant points out that the patent examiner issued a double patenting rejection of the claims of the '919 patent filed over the '750 patent. The non statutory double patenting rejection is a judicially-created doctrine grounded in public policy to prevent the unjustified or improper timewise extension of the 'right to exclude' granted by a patent and to prevent possible harassment by multiple assignees. *See In re Goodman,* 11 F.3d 1046 (Fed.Cir.1993).

According to defendant, the findings of the Patent Examiner which rejected the claims of the '919 patent on the basis of the "double patenting rejection" doctrine renders the claims of the '919 patent obvious. Plaintiff counters that one must first assume that the same patent examiner examined both patents and was right the first time and wrong the second time. (Plaintiff Br. 8). Also, according to Plaintiff, one must also assume that the only difference between the '919 patent and the references relied upon by the examiner was the presence of "at least two folding members." However, the claims of the '919 patent were not distinguished over prior art based on the number of folding members, instead, there were other elements present in the claims that made them patentable over the art. (Plaintiff Br. 8, citing Garbell Decl. Exh. 1, enclosing pages 14–18 of Plaintiff's *Markman* brief). Plaintiff seeks to turn aside defendant's "double-patenting rejection" argument because an obviousness type double-patenting rejection relates to the obviousness of the claimed invention relative to an earlier patent by the same applicant, not to the prior art. (See Manual of Patent Examining Procedure § 804 (7th Ed.1998), attached to Garbell Decl. as Exh. 2).

### 2. Obviousness on the Basis of *Tyler* and *Tuit*

Ken argues that Claim 1 of the '919 patent is obvious over Tyler (U.S. Patent No. 5,461,893 (attached to Cobrin Decl. as Exh. G)), and Tuit (U.S. Patent No. 3,420,-279 (attached to Cobrin Decl. as Exh. D)).

■ It should be noted that the '919 patent is presumed to be valid by statute. *See* 35 U.S.C. § 282. The rationale for the presumption lies in the expertise of the PTO to make the "technical factual determinations underlying the patent process." *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1574–75 (Fed.Cir.1992). A party challenging the validity of a patent has the burden of persuasion and must show clear and convincing evidence to prevail. *Buildex v. Kason Indus. Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). Moreover, the presumption of validity is "most formidable" when the party asserting invalidity relies **only**

upon prior art already considered by the PTO (emphasis added). *Central Soya Co. v. Geo A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983). Here both the Tyler and Tuit references were considered by the PTO when deciding that the claims of the '919 patent were both novel (35 U.S.C. § 102) and non obvious (35 U.S.C. § 103). Thus, the "most formidable" burden applies.

 And with this heavy burden, Ken fails. Ken concedes that alone, Tyler and Tuit do not render Claim 1 of the '919 patent obvious. Defendant only asserts that almost all of the elements of Claim 1 of the '919 patent were disclosed in the Tyler and Tuit references. But this is not enough, because references to render a claim obvious must teach or suggest *all* claim limitations. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed.Cir.1985). Tyler and Tuit, for example, do not teach a structure whereby the elongate member engages both the first and second rotary bodies, which is part of the '919 patent.[1]

### 3. Obviousness Based on "New Matter"

Section 132 of the Patent Act provides: "[n]o amendment shall introduce new matter into the disclosure of the invention." 35 U.S.C. § 132. The fundamental inquiry is whether the material added by amendment was inherently contained in the original application. *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438 (Fed. Cir.1984). 37 CFR § 1.121(a)(6) explains that an existing patent application may not be amended by adding new matter (i.e. it loses its date of priority). The Manual of Patent Examination and Procedure (MPEP) defines "new matter" as:

Matter not in the original specification, claims or drawings is usually new matter. Depending on the circumstances

such as the adequacy of the original disclosure, the addition of inherent characteristics such as chemical or physical properties, a new structural formula or a new use may be a new matter.

MPEP § 608.04(a) (citing *Ex parte Vander Wal*, 1955 WL 6578, 109 USPQ 119 (Bd. App.1955)):

The new matter prohibition is closely related to the adequate disclosure requirements of 35 U.S.C. § 112. *See Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1578 (Fed.Cir.1984). Section 112 requires:

"a written description of the invention and the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art . . . to make and use the same."

35 U.S.C. § 112 (1994). To avoid the new matter prohibition, an applicant must show that its original application supports the amended matter. *See Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1539 (Fed.Cir. 1997).

The issue of new matter arises in this case because of the examiner's position that the written description requirement was not adhered to in the application as originally filed. (Def. Opp. Obviousness Br. 17). Defendant argues that insertion 'Japan' before 'Patent No. 80607' in the '750 patent constitutes new matter. According to defendant, because the '919 patent is a continuation of the '750 patent, the '919 patent is only entitled to a filing date of October 1997, the date 'Japan' was inserted. And if October 1997 is the correct "priority date" plaintiff's commercial sales in March of 1997 render the '919 patent obvious.

Plaintiff counters that Ken's new matter argument relates only to claim 12 which includes a "cutter." (Plaintiff Br. 14, cit-

1. *See* Plaintiff Br. 11–13. Plaintiff complains that Ken's expert to advance the rest of the obviousness claims was unqualified to render an opinion because he is an expert in the diecutting and diemaking industry, not in

general metal bending. Also, Plaintiff contends that his opinions were based on legal conclusions without supporting evidence. (Plaintiff Br. 13).

ing Garbell Exh. 4, col. 2, In. 59). Entry of a new matter only possibly affects claims that depend on that "new matter." *See Waldemar Link, GmbH & Co. v. Osteonics Corp.,* 32 F.3d 556, 558 (Fed.Cir. 1994). Because defendant's new matter argument does not affect Claims 1–11, which do not require a cutter, those claims are entitled to the benefit of the Korean filing date (June 22, 1995).

Indeed, Ken did not assert obviousness as to claims 2–11. As for Claim 1, defendant's obviousness defense is useless because even if some of the claim limitations are revealed in the Tyler and Tuit patents, Ken does not meet the "formidable burden" of demonstrating that the '919 patent teaches *all* claim limitations in the Tyler and Tuit patents. As for claim 12, Defendant argues that the omission of 'Japan' from 'Patent No. 80607' made it that one skilled in the art could not practice the invention as required under 35 U.S.C. § 112. (Def.Opp.Br.19). The PTO rejected the original patent application because it was not enabling—that is, it did not disclose a cutter. *Id.* at 21. Defendant argues that this means that the disclosure must be complete and enabling as of the filing date. If it is not, the "critical date" should be moved to the date when the application was enabling. *See White Consol. Indus., Inc. v. Vega Servo–Control, Inc.,* 713 F.2d 788 (Fed.Cir.1983). According to defendant, the application was not enabling until the inventor substituted the word, "Japan" *Id.* at 22.

■ It is important to note that defendant's "new matter" argument was rejected by this court in a March 27, 2000 hearing when the Court found that geographic changes were appropriate matters for certificates of correction, and were not akin to an attempt to broaden the patent claims which would necessitate a reissue application. (Plaintiff Br. 15, *citing* Garbell Decl. Exh. 5 at 25). Both this court and the PTO did not consider geographic changes to be "new matter" because the change did not affect any claims dependent on that

new matter, as is required. In addition, Ken's argument that plaintiff's March 1997 sales of commercial embodiments render the patent obvious is futile because sale of an inventor's commercial embodiment in March 1997 cannot render a patent with a filing date of October 1997 invalid under either 35 U.S.C. §§ 102 or 103, since the sale must be more than one year before the filing date. *See* 35 U.S.C. § 102(b). Even if the sale was a year after the filing date, defendant's obviousness argument about new matter still fails because the geographic name change does not constitute new matter.

So Ken is now left to assert that the previous Tyler and Tuit patents render the '919 patent obvious. However, this argument fails because, to repeat, for an obviousness finding the prior art must teach all of the claims. *Litton Indus. Prods,* 755 F.2d at 164. The Tyler and Tuit patents teach only some of the claims and omit teaching a structure whereby the elongate member engages two rotary bodies. It follows then that the requirements for 35 U.S.C. § 103 are not met; Ken's obviousness defense falls.

### 4. *Ken's Best Mode Defense*

Defendant also moves for summary judgment for non-infringement based on the best mode defense because the inventor: 1) failed to disclose ability to bend ribbon stock of different thickness (interchangeability); and 2) failed to disclose that the driving unit should be placed below the bending area (driving unit arrangement). Under 35 U.S.C. § 112:

> "The specification shall contain a written description of the invention, and of the manner and process of making and using it ... and shall set forth the best mode contemplated by the inventor of carrying out his invention."

35 U.S.C. § 112. "The best mode requirement is intended to ensure that a patent applicant plays fair and square with the patent system ... [o]ne must not receive

the right to exclude others unless at the time of filing one has provided an adequate disclosure of the best mode known to him or her of carrying out the invention." *Bristol–Myers Squibb Co. v. Boehringer Ingelheim Corp.*, 85 F.Supp.2d 420, 422 (citations omitted) (D.N.J.2000).

 In order to find a best mode violation, the record must show that *at the time of filing* the inventor considered one mode to be superior over those modes disclosed in the specification, with respect to the claimed invention. *Minco, Inc. v. Combustion Eng'g*, 95 F.3d 1109 (Fed.Cir. 1996) (inquiry is entirely subjective); *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.* 112 F.3d 1137, 1144 (Fed.Cir. 1997). The defendant has the burden to show by "clear and convincing evidence" a best mode violation. *Minco*, 95 F.3d at 1115.

 Does section 112 cover elements not specifically claimed by the inventions? In general, "[t]he best mode inquiry is directed to what the applicant regards as the invention, which in turn, is measured by the claims." *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1532 (Fed. Cir.1991). Unclaimed elements, however, "may also be subject to the [best mode] requirement if they are necessary to implement the claimed invention." *Access Solutions Int'l, Inc. v. Data/Ware Develop., Inc.*, 70 F.Supp.2d 92, 98 (D.R.I.1999). The Federal Circuit agrees: "Indeed, most of the cases in which we have said that the best mode requirement was violated addressed situations where an inventor failed to disclose non-claimed elements that were nevertheless necessary to practice the best mode of carrying out the claimed invention." *Chemcast Corporation v. Arco Indus. Corp.*, 913 F.2d 923, 928 (Fed.Cir. 1990).

There are boundaries, however, to the best mode defense. The Federal Circuit allows that "an inventor is not required to supply [all] production specifications." *See Wahl Instruments v. Acvious, Inc.*, 950 F.2d 1575, 1579 (Fed.Cir.1991).

Indeed the inventor's manufacturing materials or sources ... used to make a device may vary from wholly irrelevant to critical. For example, if the inventor develops or knows of a particular method of making which substantially improves the operation or effectiveness of his invention, failure to disclose such peripheral development may well lead to invalidity.

*Id.* However, there the court found that the information missing in the patent application "was no more than a routine manufacturing choice" and concluded that there was no evidence that "the working of the invention ... was affected in any way by" the type of material used to join the two halves of the invention. *Id.* This holding embodies the general rule that a best mode violation exists only where the undisclosed method affects "how well [the invention] works." *See Advanced Semiconductor Materials of America, Inc. v. Applied Materials, Inc.*, 922 F.Supp. 1439, 1443 (N.D.Cal.1996); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1567 (Fed.Cir.1996) (failure to describe packaging of invention for commercial use was not a violation of § 112).

### A. The "Priority Date" Governs Best Mode Analysis

Before examining the alleged best mode violations at issue, the Court will determine if there is an issue of the "priority date" of the '919 patent, the date the patent was filed, because analysis of a best mode violation begins with the date the patent application was filed. *Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 557–58 (Fed.Cir.1994).

The parties disagree about the priority date. The '919 patent was a continuation of the '750 patent. Under 35 U.S.C. § 120, a continuation patent is entitled to the benefit of the filing date of an earlier filed application if the subject matter of the claim is disclosed in the manner provided by 35 U.S.C. § 112. Under 35 U.S.C. § 119, the claims in a U.S. application are entitled to the benefit of a foreign priority

date, or the filing date if the corresponding foreign application supports the claims in the manner required by 35 U.S.C. § 112. *Transco,* 38 F.3d at 558.

The date of the Korean patent application was June 22, 1995, and Plaintiff contends that is the critical date for measuring any best mode violation. However, Ken argues that the priority date of the '919 patent must be moved from June 1995 to October 1997 because changing the name of the Korean patent to 'Japan' resulted in the introduction of new matter because without this reference, one skilled in the art could not practice the patent.

37 CFR § 1.121(a)(6) explains that an existing patent application may not be amended by adding new matter (it loses its date of priority). Plaintiff argues that mere insertion of the word 'Japan' does not constitute new matter. Ken counters that the Patent and Trademark Office (PTO) could not determine what 'Patent No. 80607' referred to, and that the disclosure could not enable one with skill in the art to practice the invention, as required under 35 U.S.C. § 112.

To support its position, defendant points to the fact that the PTO rejected the original patent application as not enabling because it did not disclose a cutter. The *Markman* opinion held that the disclosure of the '919 patent is not limited to the cutter in patent no. 80607, but can be used with any cutter. Ken argues that such a construction would have to be supported by the specification. *See, e.g., Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988) (noting that what is patented "is defined by the words in the claims if those claims are supported by the specification in the manner required by 35 U.S.C. § 112.") Ken argues that given claim construction, there is at least a genuine issue of material fact as to whether the certificate of correction that added "Japan" to the patent constituted a new matter to require a 1997 filing date. To determine whether the certificate of correction constituted new matter requires analysis

of a recent Federal Circuit decision, *Southwest Software v. Harlequin, Inc.,* 226 F.3d 1280 (Fed.Cir.2000) recently decided.

### 1. Certificate of Corrections Under *Southwest Software*

Certificate of corrections which arise from the fault of the applicant, as here, are governed by 35 U.S.C. § 255:

**Certificate of correction of applicant's mistake**

Whenever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent and Trademark Office, appears in the patent and a showing has been made that such mistake occurred in good faith, the Director may, upon payment of the required fee, issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require reexamination. Such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had originally been issued in such corrected form.

35 U.S.C. § 255. The parties disagree about the application of section 255. The Federal Circuit has recently confronted the effect of certificates of correction in *Southwest Software.* Southwest Software owned U.S. Patent No. B15,170,257 (the "'257 patent") which was used in the printing industry to enhance the quality of printed images. *Id.* at 1282. Southwest Software alleged that Harlequin literally infringed its patent by its 'ScriptWorks Revision 6,' a similar product that enhanced the quality of printed images. *Id.* at 1283. In opposing a claim of patent infringement, Harlequin noted that there was missing from the certified copy of the '257 patent a "Program Printout Appendix" containing PostScript code for the calibration feature of the invention. *Id.* at 1287. On that basis, Harlequin moved for summary judgment that omission of the "Program Printout Appendix" rendered

several of the patent claims invalid for failure to meet the best mode and enablement requirements of 35 U.S.C. § 112.

The District Court entered judgment in favor of the patentee, Southwest Software, for patent infringement, literally and under the doctrine of equivalents. *Id.* at 1282. Harlequin appealed. The Federal Circuit held that: (1) the evidence was sufficient to establish that defendant's revised software was non-infringing; (2) the Patent and Trademark Office validly issued the certificate of correction to correct omission from patent of appendix containing relevant software code; (3) addressing an issue of first impression, a certificate was effective only for causes of action arising after it was issued; and (4) the district court's failure to construe the claim limitation required vacation of the judgment and remand for further proceedings.

The only issue relevant to our discussion case is whether a certificate of correction is effective only for causes of action arising *after* it was issued. In *Southwest Software*, the patentee requested that the PTO issue a certificate of correction for the patent under 35 U.S.C. § 254. The Certificate was issued, adding the "Program Printout Appendix" to the patent. *Id.* at 1287. Harlequin moved for summary judgment that the Certificate was invalid, and even if validly issued, was not valid in that case, because under the express language of 35 U.S.C. § 254, a certificate of correction is effective only for causes of action arising after issue. *Id.* at 1293–94. According to Harlequin, because Southwest filed its lawsuit January 20, 1995, and the certificate of correction was not issued until April 1, 1997, the certificate had no effect. *Id.* Southwest responded that the certificate of correction should be treated as if it were effective on the day the patent issued, and that any other result would nullify the language of section 254 that "such certificate shall be considered as part of the original patent." *Id.* The Federal Circuit found against Southwest and held that the Certificate of Correction was not effective as to a cause of action arising

before the Certificate was issued. *Id.* at 1297.

**██** Therefore, *Southwest Software* is not applicable here. *Southwest Software* concluded that a certificate of correction is effective only for causes of action arising *after* the certificate was issued—which is precisely the case here. Here the complaint was filed by SDS in January 1999, well after the certificate of correction was issued in 1997. Consequently, *Southwest Software* does not render the certificate of correction in this case ineffective. It is valid, and the effective date of the patent remains in 1995; Plaintiff has not committed a best mode violation on the basis of the certificate of correction.

## B. Inventor's Knowledge of Superiority of One Mode

To determine whether a best mode violation exists, the first inquiry is the inventor's subjective knowledge. If at the time the patent application was filed, the inventor had subjective knowledge of the best mode of carrying out an invention, and did not disclose it in the patent, he has committed a best mode violation. Plaintiff submits that there is no evidence that the inventor, Brian Song, ever considered either interchangeability or driving unit arrangements to be better modes of carrying out the 1995 invention.

According to Plaintiff, there can be no best mode violation absent clear and convincing evidence that the inventor knew of and appreciated, at the critical filing date, the superiority of one mode over those modes disclosed in the specification. *Minco*, 95 F.3d at 1116. On Plaintiff's submission, the evidence shows that Mr. Song was not aware of the alleged best modes until after the critical date of June 1995. Defendant answers that there is no specific intent requirement for a best mode violation and that a patent can be invalidated even if the failure to disclose the best mode is inadvertent. *See United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1215 (Fed.Cir.1996). Plaintiff argues that whatever test is adopted, de-

fendant must still prove that the inventor knew of a best mode at the time of filing the patent application, yet failed to disclose it. The only reference defendant makes to the inventor's knowledge is to testimony that the '919 patent covers Plaintiff's EasyBender device, a commercial device embodying the invention. (Ken Br. 9).

However, commercial embodiments are not equivalent to the best mode of a claimed invention. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1567 (Fed.Cir.1996). Besides, the EasyBender device depicted in Ken's exhibits is a commercial embodiment manufactured well after the critical date, having been manufactured on January 29, 2000, as revealed in the Warshavsky Decl. Exh. D. (Plaintiff Br. 6–7). The commercial embodiment contains features (including the interchangeability and driving unit arrangement features) that were first considered by the inventor and incorporated into the EasyBender device well after the critical date. The interchangeability feature was first considered by the inventor in April 1997. (Plaintiff Br. 7 citing Brian Song Decl. at 12). The first EasyBender device available with this feature was the subject of a July 1997 purchase order. (*Id.*, citing Brian Song Decl. at 12; Simon Song Decl. at 2). The driving unit was not placed below the bending area at the time Mr. Song filed the Korean patent application (See B. Song. Decl. at 4). It was first placed beneath in early 1996 (*Id.* citing Brian Song Decl. at 7 and 8.) According to SDS, Ken has no evidence to prove that both of the alleged best modes are features that the inventor was aware of in June 1995, the critical date. Hence, these features are therefore irrelevant to best mode analysis. *See Engel Industries v. Lockformer, Co.*, 96 F.3d, 1398, 1407 (Fed.Cir.1996).

### C. Interchangeability and Driving Unit are Not Subject to Best Mode Because They are Commercial Enhancements

The interchangeability and driving unit features are not subject to best mode

analysis because they were commercial embodiments created after the patent was filed. Best mode inquiry is directed to what the applicant regarded as the invention at the time of filing, which in turn is measured by the claims. *Zygo*, 79 F.3d at 1567. However, best mode analysis is not strictly limited to claim limitations. *Bristol–Myers Squibb Co. v. Boehringer Ingelheim Corp.*, 85 F.Supp.2d 420, 422 (D.N.J. 2000) ("Unclaimed elements, however, 'may also be subject to the [best mode] requirement if they are necessary to implement the claimed invention.' ").

Defendant argues that the interchangeability and driving unit features are unclaimed elements subject to the best mode requirement. (Ken Br. 2) However, there are boundaries to the unclaimed element requirements. *Bristol–Myers Squibb Co. v. Boehringer*, 85 F.Supp.2d at 422. The best mode requirement, "has nothing to do with mass production, or with sales to customers having particular requirements." *Christianson v. Colt Indus. Operating Corp.*, 822 F.2d 1544, 1563 (Fed.Cir. 1987), *vacated on jurisdictional grounds and remanded*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (holding that "since interchangeability with M–16 parts appears nowhere as a limitation in any claim ... the best mode for making and using and carrying out the claimed invention does not entail or involve interchangeability"). The unclaimed elements requirement also does not relate to routine details that are apparent to one of ordinary skill in the art. *See Young Dental Mfg. Co.*, 112 F.3d at 1144.

Plaintiff asserts that the ability to bend ribbon stock of different thickness by providing interchangeable nozzles is not related to a best mode of practicing the claimed invention. . While the claimed invention relates to a novel bending mechanism, the interchangeable nozzles relate to certain *sales* with customers with *particular requirements* (Plaintiff Br. 10). Plaintiff ad-

vertises machines that accommodate only one thickness of ribbon stock (*Id.*, citing Gilman Decl. Exh. 8; S. Song. Decl. at 3) because most customers only require a bending system that bends one size. (*See id.*) Their interchangeability feature is relevant only to the needs of a particular segment of customers and has nothing to do with the claimed invention. *See Christianson*, 822 F.2d at 1563.

Plaintiff also argues that the placement of the driving unit beneath the bending area also has no relation to the claimed invention, as it does not affect how the bending apparatus operates to bend metal. (Plaintiff Br. 10). A best mode violation exists only when the undisclosed element affects how the invention works. (*See Bristol–Myers Squibb*, 85 F.Supp.2d at 423). The '919 patent would work for its intended purpose regardless of the arrangement of the driving unit with respect to the bending area. (*Id.* citing B. Song. Decl. at 10). Ken even concedes that the placement of the bending apparatus relates only to aesthetic appearance and possibly safety. (*See* Ken Br. at 21.) According to Ken, the placement of the driving unit beneath the bending area would have the aesthetic effect of hiding a number of wires and hoses that were otherwise visible. The possible safety issue is that because the driving unit has movable parts someone could be injured. (Ken Br. at 21; B. Song. Decl. at 10). Courts recognize that it is impractical for an inventor to disclose every possible aesthetic or safety issue to avoid a best mode defense. Plaintiff argues that under those circumstances, an inventor would have to also set forth his favorite color for his machine to avoid a best mode defense. The absurdity of this result is one reason why courts do not consider commercial uses when reviewing best mode. *See Zygo Corp.*, 79 F.3d at 1567 ("The focus of a [best mode] inquiry is not what a particular user decides to make and sell . . .")

Defendant's best mode defenses based on the interchangeability and driving unit features cannot be accepted by the Court because these features were introduced after the filing date of the patent for commercial reasons, and were not part of the claims. Even if considered "unclaimed elements," they are not subject to defendant's attack because best mode has nothing to do with sales to customers having particular requirements, or commercial embodiments. Best mode will serve as a defense only when it is not apparent to one of ordinary skill in the art and was not revealed as the best mode.

### 5. Ken's Supplemental Reply Brief of Non–Infringement for the "Split–Pin" Multi–Bender

Ken has filed a "Supplemental and Reply Brief" which alleges non-infringement of the '919 patent due to its new "Split–Pin" Multi–Bender machine. The parties disagree mightily as to the propriety of Ken's filing. At the outset, pursuant to Local Rule 7.1, this Court does not permit Supplemental and Reply Briefs.

In a follow-up deposition of Dale Kengott, president of Ken Specialties, Mr. Kengott testified for the first time about a new "split-pin bending mechanism"—a change implemented by Ken's Korean supplier because of a patent injunction in Korea. (Kengott 6/14/00 Dep. at 455). Mr. Kengott had known about the change since early May 2000, but had not yet seen it. *See id.* at 455–56. Ken's customers were not told of the split-pin bending mechanism. *Id.* at 463. Ken designated the split-pin bending mechanism as confidential (*Id.* at 460), and despite Ken's obligation to remove confidential designations where such description is inappropriate, the design remains confidential.

Plaintiff's counsel attempted to find out more about the split-pin bending mechanism, but was refused by Ken's counsel, who cited "confidentiality." Ken has not supplemented a single interrogatory answer or document request with regard to the new split-pin bending mechanism. Because of these discovery abuses, plaintiff

suggests that defendant's "Supplemental and Reply Brief" be stricken.

Even if this Court does not strike Ken's submission, it fails for a more fundamental reason: Ken admitted that the new split-pin machine is not part of the present litigation. It stated that the split-pin bending mechanism "is not accused of infringement, has not been sold and is not relevant to any issues regarding infringement of the old design." (*See* Plaintiff Letter Brief, August 31, 2000, Exhibit 2, attaching a June 30, 2000 letter from defendant's counsel). By Ken's own admission, the new split-pin bending machine is not part of this litigation.

Plaintiff asserts that this Court does not have jurisdiction over Ken's summary judgment motion for the split-pin bending mechanism. The Court agrees. *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631 (Fed.Cir.1991) was an appeal of a dismissal of a declaratory judgment action of invalidity or non-infringement of a patent. *Id.* at 632. The Court noted that the long established rule is that a declaratory judgment plaintiff must establish an actual controversy on the "totality of the circumstances." *Id.* at 634, *citing Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

██ In cases involving a declaratory judgment of patent non-infringement or invalidity, the test for determining whether an actual controversy exists is two-pronged. First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. *Id.* at 634 (citations omitted). The first prong "looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial." *Id.* (Citations omitted). Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues. *Id.* (Citations omitted). If these prongs are not met, the court is divested of jurisdiction. *Id.* at 633 (Where plaintiff cannot demonstrate an objectively reasonable apprehension that it will face infringement, the Court is divested of jurisdiction).

██ Here, both prongs are not satisfied. The first prong is not met because it cannot be said that Ken produced or is prepared to produce the allegedly infringing product. Ken's president admitted that he had not seen the new Split–Pin Multi–Bender machine, so it cannot be alleged that Ken knew that this machine infringed SDS' machine. Further, SDS' lawsuit asserted that Ken's *original* Multi–Bender machine infringed its EasyBender machine. SDS did not know and could not find out about the split-pin machine because it was "confidential." SDS had not conducted any discovery on this new machine. A few questions in Dale Kengott's June 14, 2000 deposition, and Kengott's rough sketch of a machine which he admittedly had never seen, does not count as meaningful discovery. The second prong also is not met. Ken did not have a "reasonable apprehension" that SDS would file suit on the basis of the new split-pin machine. Until Dale Kengott's June 14, 2000 deposition, SDS had not heard of this new machine, so it could not have contemplated that this new machine infringed its Easy-Bender machine. Simply said, the new "Split–Pin" Multi–Bender machine is not, and never has been, part of this lawsuit. In accordance with *Spectronics*, this Court does not have jurisdiction to hear Ken's motion for non-infringement based on the "Split–Pin" Multi–Bender machine.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment for literal infringement is granted; defendant's motion for partial summary judgment for non-infringement on the basis of its obviousness and best mode defenses is denied; defendant's motion for declaratory judg-

ment of non-infringement of its new split-pin bending machine is also denied.